1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  EASTERN DISTRICT OF CALIFORNIA

10                         ----oo0oo----

11

12   CLEAN WATER SOCAL and CENTRAL        No. 2:23-cv-01149 WBS JDP
     VALLEY CLEAN WATER ASSOCIATION,
13
                 Plaintiffs,
14                                        MEMORANDUM AND ORDER RE:
          v.                              PLAINTIFFS' MOTION FOR
15                                        PRELIMINARY INJUNCTION
     UNITED STATES ENVIRONMENTAL
16   PROTECTION AGENCY; and TOMAS
     TORRES, DIRECTOR, WATER DIVISION
17   of UNITED STATES ENVIRONMENTAL
     PROTECTION AGENCY, REGION IX,
18
                 Defendants.
19

20                         ----oo0oo----

21          Plaintiffs Clean Water SoCal and Central Valley Clean

22   Water Association (collectively "plaintiffs") are trade

23   associations with member agencies that own and operate wastewater

24   treatment plants and water reclamation plants.  (See Compl. ¶ 11

25   (Docket No. 1).)  Plaintiffs seek declaratory and injunctive

26   relief against defendants United States Environmental Protection

27   Agency ("EPA") and the EPA's Director of the Water Division for

28   Region IX, Tomas Torres (collectively "defendants").  (See

                                    1

1   <u>generally</u> Compl.)

2          Plaintiffs allege that defendants' approval of the

3   California State Water Board's (the "State Water Board") new

4   water quality standards (the "Toxicity Provisions") violated the

5   Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 and 702 <u>et</u>

6   <u>seq.</u>, and the various statutes and regulations responsible for

7   implementing the Clean Water Act, 33 U.S.C. § 1251 <u>et seq.</u> and 40

8   C.F.R. Part 131.  (<u>See generally</u> Compl.)  Specifically,

9   plaintiffs challenge the EPA's approval of the Toxicity

10  Provision's requirement that water toxicity testing be analyzed

11  using a method of statistical analysis known as the Test of

12  Significant Toxicity ("TST").

13         Before the court is plaintiffs' motion for preliminary

14  injunction.[1]  (Docket No. 15.)

15  I.   <u>Background</u>

16      A.   <u>Statutory and Regulatory Framework</u>

17         "The Clean Water Act prohibits 'the discharge of any

18  pollutant by any person' into the waters of the United States

19  without a permit."  <u>S. Cal. All. of Publicly Owned Treatment</u>

20  <u>Works v. EPA</u> (hereinafter "<u>SoCal Works</u>"), 8 F.4th 831, 834 (9th

21  Cir. 2021) (quoting 33 U.S.C. § 1311(a)).  The Clean Water Act

22  allows the EPA "to delegate permitting responsibility to the

23  States."  (<u>SoCal Works</u>, 8 F.4th at 834) (citing 33 U.S.C. §

24  1342(b)); <u>see also</u> 40 C.F.R. § 131.4(a) ("States . . . are

25  _____

26      [1]   Plaintiffs request that the court take judicial notice
    of 11 documents, all of which are documents of public record.

27  (<u>See</u> Reqs. for Judicial Notice (Docket Nos. 15-2, 30-2).)  The
    court will grant plaintiffs' request for judicial notice because

28  matters of public record are not reasonably subject to dispute.
    <u>See</u> <u>Lee v. City of L.A.</u>, 250 F.3d 668, 689 (9th Cir. 2001).

1  responsible for reviewing, establishing, and revising water
2  quality standards"). As of 2021, California was one of 47 states
3  to which the EPA had transferred permitting authority. <u>SoCal</u>
4  <u>Works</u>, 8 F.4th at 834.

5         EPA's regulations require states to establish
6  limitations on the amounts of pollutants that permitholders may
7  discharge. <u>See</u> 40 C.F.R. § 131.11. "Pursuant to the Clean Water
8  Act's National Pollutant Discharge Elimination System ["NPDES"],
9  33 U.S.C. § 1342(a), states retain discretion, subject to EPA
10  guidance and recommendations, to set their toxicity thresholds in
11  order to compensate for local conditions at the permitting
12  stage." <u>Edison Elec. Inst. v. EPA</u>, 391 F.3d 1267, 1273-74 (D.C.
13  Cir. 2004).

14         Because a discharge can be toxic even when it complies
15  with the EPA's limitations on pollutants, "the EPA also requires
16  certain permitholders to pass a test called a 'whole effluent
17  toxicity' (WET) test." <u>SoCal Works</u>, 8 F.4th at 834 (citing 40
18  C.F.R. § 122.44(d)(1)(iv)). A WET test "measures the aggregate
19  effect of aquatic discharge on aquatic organisms . . . by
20  exposing a test population of organisms to a discharge and
21  counting how many die or become immobilized." <u>Id.</u> (citing 60
22  Fed. Reg. 53, 529, 53, 532 (Oct. 16, 1996)); <u>see also</u> <u>Edison</u>
23  <u>Elec.</u>, 391 F.3d at 1272-73 (describing the WET test).

24         Because toxicity "is not measurable as an absolute
25  amount or concentration[,] . . . . the biological results of a
26  WET test must be analyzed through a statistical approach."
27  (Vacano Decl., Ex. 1 ("EPA Approval") at 21 (Docket No. 22-1).)
28  EPA regulations list some methods of statistical analysis but

1  expressly state that they are "not the only possible methods."

2  67 Fed. Reg. 69964.

3      B.   <u>The TST Method of Statistical Analysis</u>

4         In 2010, the EPA issued a new guidance document which

5  "describe[ed] the TST as another statistical approach for permit

6  writers to consider" when analyzing WET tests.[2]  (EPA Approval at

7  26-27.)  "[B]ecause 'not toxic' does not have an inherent

8  meaning, the application of the TST components is used to define

9  what constitutes 'not toxic' and thus the desired condition of

10  the water body."  (<u>Id.</u> at 24).  Unlike previous statistical

11  methods used to analyze WET tests, "TST presumes that a sample is

12  toxic absent statistically significant evidence to the contrary."

13  <u>SoCal Works</u>, 8 F.4th at 835.  The TST is not explicitly listed as

14  a method of statistical analysis in the EPA regulations.

15      C.   <u>Factual Background</u>[3]

16  _____

[2]    "EPA developed the TST to provide increased confidence
17  in toxicity data assessment by controlling for specific types of
errors that are typical in hypothesis testing."  (EPA Approval at
18  26.)

19     [3]    Plaintiffs have challenged the EPA's approval of the
TST twice before.  In 2014, plaintiffs brought an action in this
20  district challenging the EPA's approval of California's use of
the TST as an "alternative test procedure" under 33 U.S.C. §
21  1314(h) and 40 C.F.R. §§ 136.3(a), 136.5.  <u>See S. Cal. All. of
POTWs v. EPA</u>, No. 2:14-cv-01513 MCE DB.  The case was dismissed
22  as moot after the EPA withdrew its approval.  In 2016, plaintiffs
brought another action in this district, this time alleging that
23  the EPA violated both the APA's notice-and-comment rulemaking
procedures and the EPA's own regulations by allowing the use of
24  the TST when issuing permits.  <u>See S. Cal. All. of POTWs v. EPA</u>,
No. 2:16-cv-02960 MCE DB.  The district court dismissed the case
25  on the ground that it was barred by the APA's statute of
limitations.  <u>See id.</u>, 297 F. Supp. 3d 1060, 1073 (E.D. Cal.
26  2018) (England, J.).  Plaintiffs appealed.  In 2021, the Ninth
Circuit affirmed dismissal, but on the alternative ground that
27  the 2010 guidance involving the TST was not a final agency action
because it did not impose any legal consequences.  <u>SoCal Works</u>, 8
28  F.4th at 836.

1    In October 2021, the State Water Board adopted the
2 state's revised regulations regarding water toxicity, known as
3 the Toxicity Provisions.  (Compl. ¶ 7.)  The Toxicity Provisions
4 require that aquatic toxicity test data be analyzed using the
5 TST.  (EPA Approval at 13.)  On April 25, 2022, the Toxicity
6 Provisions were formally approved by the State, thereby becoming
7 state law.  (EPA Approval at 20; Mot. at 15.)  Two days later,
8 the State Water Board submitted the Toxicity Provisions to
9 defendants for review and approval, as is required by the Clean
10 Water Act, 33 U.S.C. § 1313(c).[4]  (Opp'n at 8.)

11    On May 1, 2023, defendants issued final approval of the
12 Toxicity Provisions. (Compl. ¶ 8; see generally EPA Approval.)
13 As a result of defendants' approval, the Toxicity Provisions'
14 requirement that the TST be used to analyze WET tests became
15 effective under the Clean Water Act.  See 40 C.F.R. § 131.21(c).
16 Subsequently, on May 22, 2023, plaintiffs filed their Complaint
17 and, a few weeks later, moved for a preliminary injunction.[5]

18    As explained above, plaintiffs allege that defendants'
19 approval of the Toxicity Provisions' new requirement that water
20 toxicity testing be analyzed using the TST was arbitrary and

21

22    [4]   Once a state submits its new or revised water quality
23 standards, the EPA has 60 days to approve the standards or 90
days to disapprove the standards.  40 C.F.R. § 131.21.

24    [5]   In July 2022, plaintiffs (and others) filed a similar
25 case in state court, challenging California's adoption of the
Toxicity Provisions. (Mot. at 15; Camarillo Sanitary Dist. v.
26 State Water Res. Control Bd., No. 22CECG02195 (Fresno Sup. Ct.).)
In May 2023, the state court denied plaintiffs' ex parte
27 application for a TRO or stay. (See Opp'n at 9.) The hearing on
the merits in that case was scheduled for June 23, 2023.  (Mot.
28 at 15).  There is nothing before this court to provide the status
of that action.

1   capricious, in violation of the APA.  (See generally Compl.)

2   II.  Discussion

3            "[I]njunctive relief [i]s an extraordinary remedy that

4   may only be awarded upon a clear showing that the plaintiff is

5   entitled to such relief."  Winter v. Nat. Res. Def. Council,

6   Inc., 555 U.S. 7, 22 (2008).  To obtain a preliminary injunction,

7   the moving party must establish (1) it is likely to succeed on

8   the merits, (2) it is likely to suffer irreparable harm in the

9   absence of preliminary relief, (3) the balance of equities tips

10   in its favor, and (4) an injunction is in the public interest.

11   Id. at 20; Humane Society of the U.S. v. Gutierrez, 558 F.3d 896,

12   896 (9th Cir. 2009).  "A plaintiff must make a showing on all

13   four prongs to obtain a preliminary injunction."  A Woman's

14   Friend Pregnancy Res. Clinic v. Becerra, 901 F.3d 1166, 1167 (9th

15   Cir. 2018) (emphasis in original) (quotation marks and citations

16   omitted).

17       A.   Likelihood of Irreparable Harm

18            "[A] preliminary injunction will not be issued simply

19   to prevent the possibility of some remote future injury."

20   Winter, 555 U.S. at 21.  "A threat of irreparable harm is

21   sufficiently immediate to warrant preliminary injunctive relief

22   if the plaintiff 'is likely to suffer irreparable harm before a

23   decision on the merits can be rendered.'"  Boardman v. Pac.

24   Seafood Grp., 822 F.3d 1011, 1023 (9th Cir. 2016) (quoting

25   Winter, 555 U.S. at 22).  "Speculative injury does not constitute

26   irreparable injury sufficient to warrant granting a preliminary

27   injunction."  Id.

28            Both sides agree that this matter may be presented to

6

1  the court for final decision upon briefs as soon as the

2  administrative record is prepared, and government counsel

3  represented that it would take approximately 30 days for the EPA

4  to assemble and produce the administrative record.  The parties

5  thus estimated that it should only take about 60 to 90 days

6  before the court could hear this case on the merits.

7          Plaintiffs argue that their members will be irreparably

8  harmed because they: (1) "will be subject to enforcement, civil

9  (and potentially criminal) penalties, and citizen suits for

10  failure to comply with new water quality standards; and (2) will

11  "be subject to economic harm, as they will now be required to

12  undertake more costly and burdensome toxicity testing

13  requirements." (Mot. at 26.)  However, plaintiffs provide no

14  tangible evidence that any civil enforcement actions or criminal

15  penalties are likely to occur in the short time before the court

16  can issue a decision on the merits.  See Boardman, 822 F.3d at

17  1023 (plaintiff must demonstrate likelihood of suffering

18  irreparable harm "before a decision on the merits can be

19  rendered") (citation and quotation omitted).

20          Both the State Water Board and its regional

21  counterparts have been issuing permits which require the TST

22  since at least 2012. (See Mitschele Decl. ¶ 3 (Docket No. 22-

23  3).)  As of April 30, 2023, at least 190 effective NPDES permits

24  have been issued that require the TST.  Id. ¶ 4.  Absent a

25  showing that criminal or civil actions are imminent or likely to

26  occur, any harm is speculative and not immediate.  Moreover,

27  "economic injury alone does not support a finding of irreparable

28  harm, because such injury can be remedied by a damage award."

1    Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.,

2    944 F.2d 597, 603 (9th Cir. 1991) (citation omitted).[6]

3          For the foregoing reasons, plaintiffs have failed to

4    demonstrate the likelihood of irreparable harm before the court

5    can issue a decision on the merits, and for that reason alone the

6    court would be required to deny their request for a preliminary

7    injunction.

8       B.   Likelihood of Success on the Merits

9          Even assuming plaintiffs were able to show a likelihood

10   of irreparable harm, they nonetheless fail to show a likelihood

11   of success on the merits.

12          "Section 706(2)(A) of the APA requires a reviewing

13   court to uphold agency action unless it is 'arbitrary,

14   capricious, an abuse of discretion, or otherwise not in

15   accordance with law.'"   San Luis & Delta-Mendota Water Auth. v.

16   Locke, 776 F.3d 971, 994 (9th Cir. 2014) (quoting 5 U.S.C. §

17   706(2)(A)).  "'The court's responsibility is narrow[]: to

18   determine whether the' agency complied with the procedural

19   requirements of the APA."   Id. (quoting River Runners for

20   Wilderness v. Martin, 593 F.3d 1064, 1070 (9th Cir. 2010)).  A

21   court will therefore "'sustain an agency action if the agency has

22   articulated a rational connection between the facts found and the

23   conclusions made.'"   Id. (quoting Pac. Coast Fed'n of Fishermen's

24   Ass'ns v. U.S. Bureau of Reclamation, 426 F.3d 1082, 1090 (9th

25       [6]   Even if economic harm could support a finding of

26   irreparable harm, plaintiffs do not provide any evidence in
    support of their conclusory allegations that their costs will

27   increase.  While plaintiffs don't need to provide the exact costs
    they expect to incur, the court expects more than the vague

28   generalizations presented here.

1    Cir. 2005).  "[T]raditional deference to the agency is at its
2    highest where a court is reviewing an agency action that required
3    a high level of technical expertise."  Id. (citing Marsh v.
4    Oregon Nat. Res. Council, 490 U.S. 360, 377 (1989)) (additional
5    citation omitted); see Edison Elec., 391 F.3d at 1270 (a court
6    must give deference to the EPA "when it evaluates 'scientific
7    data within its technical expertise.'") (quoting City of Waukesha
8    v. EPA, 320 F.3d 228, 247 (D.C. Cir. 2003)).

9          As explained above, plaintiffs challenge defendants'
10   approval of the State Water Board's requirement of the TST.
11   "States have the primary role, under § 303 of the [Clean Water
12   Act], 33 U.S.C. § 1313, in establishing water quality standards.
13   EPA's sole function, in this respect, is to review those
14   standards for approval."  Am. Wildlands v. Browner, 260 F.3d
15   1192, 1194 (10th Cir. 2001) (citations and internal quotations
16   omitted); see also 33 U.S.C. § 1251(b) ("It is the policy of the
17   Congress to recognize, preserve, and protect the primary
18   responsibilities and rights of States to prevent, reduce, and
19   eliminate pollution . . . .").

20         Thus, the EPA's role in approving state water quality
21   standards "is limited."  See id.; see also NRDC v. EPA, 16 F.3d
22   1395, 1399 (4th Cir. 1993) ("EPA sits in a reviewing capacity of
23   the state-implemented standards, with approval and rejection
24   powers only."); Barnum Timber Co. v. EPA, 835 F. Supp. 2d 773,
25   780-81 (N.D. Cal. 2011) (the Ninth Circuit "has taken a similar
26   position" to NRDC "with respect to a state's role in the
27   process") (citing City of Arcadia v. EPA, 411 F.3d 1103, 1106
28   (9th Cir. 2005)) (section 1313 is "consistent with the basic

1  goals and policies that underlie the Clean Water Act -- namely,

2  that states remain at the front line in combatting pollution").

3         Under 40 C.F.R. § 131.5(a), the EPA must consider eight

4  factors when reviewing a state's adopted water quality standards.

5  Here, plaintiffs claim defendants' approval of the TST, as

6  mandated by the Toxicity Provisions, was arbitrary and capricious

7  because defendants' review failed to consider two factors: (1)

8  applicable legal procedures; and (2) sound scientific rationale.

9  (See generally Mot.)

10        Below, the court will first address whether the State

11 Water Board followed applicable legal procedures before

12 addressing whether the State Water Board's criteria was based on

13 sound scientific rationale.

14             1.   Applicable Legal Procedures

15        Under 40 C.F.R. § 131.5(a)(6), defendants must consider

16 "[w]hether [California] has followed applicable legal procedures

17 for revising or adopting standards."  Plaintiffs argue that

18 defendants' review did not comply with 40 C.F.R. § 131.5(a)(6)

19 because: (1) defendants "failed to . . . confirm that the State

20 Water Board followed appropriate legal procedures when drafting

21 the Toxicity Provisions"; and (2) "the State Water Board abused

22 its rulemaking discretion when it drafted the Toxicity Provisions

23 relying on EPA guidance rather than final, promulgated rules."

24 (Mot. at 23.)  On the record before the court, both arguments are

25 without merit.

26        First, as described in the EPA Approval, "California's

27 development of its new [water quality standards] regarding

28 toxicity included opportunities for public input at more than

                                   10

1   three dozen meetings throughout the State since 2012.  California

2   solicited public comments and prepared responses to those

3   comments on October 26, 2018; July 22, 2020; and September 30,

4   2021."  (EPA Approval at 20.)  Further, the California Attorney

5   General certified that the Toxicity Provisions were adopted

6   pursuant to California law.  (Id.)

7          Second, although EPA regulations do not list the TST as

8   a method of statistical analysis, the regulations expressly

9   provide that the listed methods are "not the only possible

10  methods of statistical analysis."  67 Fed. Reg. 69964.  Moreover,

11  the State Water Board's reliance on the EPA's non-binding

12  guidance is precisely how states are supposed to revise their

13  water quality standards.  See Sanitary Bd. of City of Charleston,

14  W.Va. v. Wheeler, 918 F.3d 324, 328 (4th Cir. 2019) ("Apart from

15  its oversight and approval role, the EPA also develops guidance .

16  . . which states in turn rely on in evaluating and updating their

17  standards.").

18         The only thing plaintiffs point to as evidence that the

19  State Water Board did not follow applicable legal procedures is

20  its decision to rely on EPA guidance documents, as opposed to

21  promulgated rules, when adopting the TST as the required method

22  of statistical analysis for WET tests.  However, as discussed

23  above, it was well within the State Water Board's discretion to

24  do rely on EPA guidance documents.  The court therefore finds

25  nothing in the record which would suggest that the State Water

26  Board did not follow the applicable legal procedures when

27  adopting the Toxicity Provisions.  For the foregoing reasons, the

28  court finds defendants followed applicable legal procedures when

11

1  they approved the Toxicity Provisions.

2              2.   <u>Sound Scientific Rationale</u>

3        Under 40 C.F.R. § 131.5(a)(2), defendants must consider

4  "[w]hether [California] has adopted criteria that protect the

5  designated water uses based on sound scientific rationale

6  consistent with § 131.11."

7        In their approval of the Toxicity Provisions,

8  defendants explained that they "considered the scientific

9  justification included in the submittal supporting document and

10 also reviewed EPA Technical Documents and additional peer-

11 reviewed science." (EPA Approval at 26.)  The peer-reviewed

12 literature describes that the TST "provides greater confidence

13 that truly non-toxic water samples are identified as non-toxic

14 and truly toxic water samples are identified as toxic," "reduces

15 the likelihood of missing true toxicity when it occurs (false

16 negative), and "reduces the likelihood of declaring a sample

17 toxic when there is a biologically insignificant effect (false

18 positive result)." (<u>Id.</u> at 27.)  Defendants also explained that

19 the type of hypothesis testing upon which the TST is based "has

20 long been used in many contexts, from evaluating clinical trials

21 of pharmaceutical products, to evaluating the attainment of soil

22 cleanup standards from contaminated sites, to evaluating the

23 effects of pesticides in experimental ponds." (<u>Id.</u> at 26.)

24        Conversely, plaintiffs argue that the TST does not

25 constitute sound scientific rationale because TST test results

26 differ from promulgated testing methods and "can have a false

27 indication of toxicity rate of over 50 percent." (Compl. ¶ 61;

28 Mot. at 21.)  Plaintiffs do not cite any technical study or peer-

1    reviewed research in support of this position in either their
2    Complaint or Motion.   In their Reply, plaintiffs cite a white
3    paper (the "CASA White Paper"), which they contend shows that the
4    TST has a high risk of false positives.  (Reply at 11; <u>see</u>
5    Hamilton Decl., Ex. A ("CASA White Paper") (Docket No. 30-1).)
6    However, as defendants correctly point out, the CASA White Paper
7    is not a peer-reviewed study and focuses on only one of the many
8    aquatic toxicity test methods approved under EPA regulations.
9    (<u>See</u> Surreply at 4-5 (Docket No. 33).)   Further, the CASA White
10   Paper was submitted to the State Water Board by an interested
11   party (the California Association of Sanitation Agencies) during
12   the notice and comment for the Toxicity Provisions.  (<u>See</u>
13   <u>generally</u> CASA White Paper.)

14          Plaintiffs also argue that "[s]tandards where the water
15   is presumed to be toxic cannot logically protect the aquatic life
16   uses -- they would all be dead."  (Mot. at 21.)  This argument is
17   nonsensical.  The TST is a method of statistical analysis.  The
18   TST uses a null hypothesis that the sample water is toxic.  (<u>Id.</u>
19   at 27.)  The TST method's presumption of toxicity is an
20   analytical hypothesis, not a factual statement that all water is
21   in fact toxic.  Moreover, it does not follow that an analytical
22   hypothesis which presumes water toxicity means that all aquatic
23   life is dead.

24          There is nothing in the EPA Approval to support the
25   claim that the TST, as adopted in the Toxicity Provisions, is not
26   based on "sound scientific rationale."  <u>Cf.</u> <u>San Luis</u>, 776 F.3d at
27   9940 ("[T]raditional deference to the agency is at its highest
28   where a court is reviewing an agency action that required a high

1  level of technical expertise."); Ctr. for Regul. Reasonableness

2  v. EPA, No. 16-cv-1435, 2019 WL 1440303, at *10 (D. D.C. Mar. 31,

3  2019) (describing a case involving EPA's approval of a state's

4  water quality criteria as "a classic example of a case warranting

5  deference to EPA on scientific and technical matters within its

6  sphere of expertise").  Therefore, on the record before the

7  court, defendants properly considered whether California's

8  adoption of the TST was based on sound scientific rationale.

9        For the foregoing reasons, the court finds that

10  defendants reviewed the Toxicity Provisions consistent with 40

11  C.F.R. § 131.5(a).  Defendants' approval of the Toxicity

12  Provisions was therefore not arbitrary and capricious.  See 5

13  U.S.C. § 706(2)(A).

14  III. CONCLUSION

15        Because plaintiffs have failed to show that they are

16  likely to suffer irreparable harm or are likely to succeed on the

17  merits, plaintiffs' motion for a preliminary injunction must be

18  denied.  See A Woman's Friend Pregnancy Res. Clinic, 901 F.3d at

19  1167 (plaintiffs "must make a showing on all four prongs to

20  obtain a preliminary injunction") (quotation marks and citations

21  omitted).

22        IT IS THEREFORE ORDERED that plaintiffs' motion for

23  preliminary injunction (Docket No. 15) be, and the same hereby

24  is, DENIED.

25  Dated:  August 7, 2023

      WILLIAM B. SHUBB
26    UNITED STATES DISTRICT JUDGE

27

28